UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
(ROCK HILL DIVISION)

| | | |
|---|---|---|
| **TIFFANY COLEMAN, KELI SWANN,** | } | |
| **and HEATHER BROOKE,** | } | |
| **individually and on behalf of all others** | } | |
| **similarly situated,** | } | |
| | } | |
| **Plaintiffs,** | } | **CASE NO.: 0:21-cv-00721-SAL** |
| | } | |
| **v.** | } | |
| | } | |
| **BRITAX CHILD SAFETY, INC.,** | } | |
| | } | |
| **Defendant.** | } | |
| _____ | } | |

## AMENDED COMPLAINT

Plaintiffs Tiffany Coleman, Keli Swann, and Heather Brooke ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendant Britax Child Safety, Inc., ("Defendant" or "Britax"), and in support allege, upon information and belief and based on the investigation of their counsel, as follows:

### INTRODUCTION

1.     Motor vehicle accidents are a leading cause of death among children.[1]  In 2018, side-impact collisions accounted for approximately 25% of the fatalities for children under the age of 15.  Children who survive side-impact collisions often sustain serious injuries such as traumatic brain injuries, concussions, neck injuries, whiplash, broken bones, spinal cord injuries, or

---

[1] https://www.cdc.gov/transportationsafety/child_passenger_safety/cps-factsheet.html (last visited March 2, 2021).

paralysis.[2]

2.      Booster seats, which use a car's own seat belt system to restrain a child, provide less protection in a motor vehicle collision than car seats with harnesses.  Manufacturers, eager to increase their sales by having parents move their children from car seats to booster seats, have for years sought to reassure parents that the booster seats would be safe in side-impact collisions by proclaiming that their booster seats have special side-impact protection and that the booster seats have been side-impact tested.

3.      Since the average parent is not in a position to conduct his or her own safety testing, in order to make informed purchasing decisions, they must rely on the marketing, labeling, and representations of car seat manufacturers regarding the safety of a given car seat and its appropriateness for children of a specific age and/or size.

4.      To encourage parents not only to purchase its booster seats but also to pay a higher price for its models, Defendant Britax marketed its booster seats as having "2 Layers of Side Impact Protection" or, for a more substantial price, having "3 Layers of Side Impact Protection."

5.      Britax has identified its "layers of side impact protection" as one of the company's "proudest safety innovations."  Britax also has pronounced that it has "side impact tested" its booster seats in order to convince parents that it has validated its side-impact safety claims.  And to ensure that parents trust these safety claims over those of its competitors, Britax has named itself

---

[2] Subcommittee on Economic and Consumer Policy, Staff Report, "Booster Seat Manufacturers Give Parents Dangerous Advice: Misleading Claims, Meaningless Safety Testing, and Unsafe Recommendations to Parents About When They Can Transition Their Children from Car Seats to Booster Seats at 1 (Dec. 10, 2020), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2020-12-10%20Subcommittee%20on%20Economic%20and%20Consumer%20Policy%20Staff%20Report%20on%20Booster%20Seat%20Investigation.pdf ("House Subcommittee Report").

"Britax Child Safety, Inc." and anointed itself as the "#1 brand in safety technology":



6.     On December 10, 2020 -- after a 10-month investigation of the seven leading booster seat manufacturers, including Defendant Britax -- the U.S. House of Representatives Subcommittee on Economic and Consumer Policy published a report of the results of that investigation: *Booster Seat Manufacturers Give Parents Dangerous Advice: Misleading Claims, Meaningless Safety Testing, and Unsafe Recommendations to Parents About When They Can Transition Their Children from Car Seats to Booster Seats*.[3]

7.     After having reviewed thousands of previously non-public documents produced by the seven manufacturers, the Subcommittee concluded that booster seat manufacturers, including Defendant Britax, "have endangered the lives of millions of American children and misled consumers about the safety of booster seats by failing to conduct appropriate side-impact testing [and] deceiving consumers with false and misleading statements

---

[3] *Id.*

and material omissions about their side-impact testing protocols . . . ."[4]  The House Subcommittee report found that Britax has made "unsubstantiated claims about proprietary safety features in side-impact crashes," that the "features are untested, and [that] their advertisements provide consumers with a false sense of security." The report concluded: "It is unfair and deceptive to advertise a safety feature without evidence that it improves safety."[5]

8.    In short, in an effort to achieve maximum profits, Defendant Britax has deceived parents with its false and misleading marketing into believing (1) that they can safely move their children from car seats with harnesses at an earlier stage without fear of motor vehicle collisions and (2) that Britax has superior safety technology giving their seats a higher market value.

9.    Plaintiffs bring this action individually and on behalf of all other similarly situated consumers to halt the dissemination of Defendants' fraudulent and misleading representations, to correct the false and misleading perceptions that Defendants have created in the minds of consumers, and to obtain redress for those who have actually purchased Britax's booster seats.

## **PARTIES**

10.    Plaintiff Tiffany Coleman is a resident and citizen of Bloomington, Indiana.

11.    Plaintiff Keli Swann is a resident and citizen of Raleigh, North Carolina.

12.    Plaintiff Heather Brooke is a resident and citizen of Clearwater, Florida.

13.    Defendant Britax is one of the leading manufacturers and marketers of infant and juvenile products, including the booster seats at issue here. Britax is a South Carolina corporation with its principal place of business located in York County at 4140 Pleasant Road, Fort Mill, South

---

[4] *Id.* at 1.
[5] *Id.* at 22.

Carolina 29708.

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331, as this class action alleges a claim under the Magnuson-Moss Warranty Act, the amount in controversy is equal to or exceeds $50,000, exclusive of interest and costs, there are more than 100 class members, and the amount-in-controversy of any individual claim exceeds $25.  15 U.S.C. § 2310(d)(3)(B).

15.     This Court also has original jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, there are more than 100 class members, and at least one class member is a citizen of a state different from Britax.

16.     The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

17.     The Court has personal jurisdiction over Britax because the company is headquartered in this District, has regular and systematic contacts with this District, and places its products into the stream of commerce from this District, including the booster seats purchased by Plaintiffs and the potential class members.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Britax maintains its headquarters in this District.

## GENERAL FACTUAL ALLEGATIONS

### A.  The Development of the Market for Car Seats and Booster Seats

19.     The first child restraint systems were introduced in 1968, and the first child passenger safety law was passed in Tennessee 10 years later.

20.     In the late 1970s, the U.S. public's increasing awareness of the high rates of mortality and severe injury for child passengers resulted in a rapid proliferation of state laws addressing the issue.  Between 1977 and 1985, all 50 states adopted laws aimed at reducing harm to infants and child passengers in motor vehicle accidents by requiring the use of a child restraint device.

21.     Beginning in the 1990s, the National Highway Traffic Safety Association ("NHTSA"), as well as professional associations like the American Academy of Pediatrics ("AAP"), developed child passenger safety standards and guidelines that cover a wider range of child passenger safety issues and better protect children from injuries.  Among other things, they emphasized the importance of designing and using child safety restraints tailored to the age and size of individual child passengers.

22.     Though models vary, the market for children's car safety seats is generally grouped around the three basic designs that track, sequentially, with children's growing weights and heights: rear-facing seats, forward-facing seats with harnesses, and belt-positioning booster seats.

23.     Booster seats use the car's own seat belt system to restrain the child.  The booster seats "boost" the child's height so that the car's seat belt is positioned to fit properly over the stronger parts of the child's body.[6]

24.     In 1992, a NHTSA flyer pending approval that addressed car and booster seats was circulated to manufacturers of car seats.  That flyer stated with respect to booster seats: "A toddler over one year of age, weighing 20 to 40 pounds, is not big enough for a booster seat in the

---

[6] https://www.nhtsa.gov/equipment/car-seats-and-booster-seats#car-seat-types

car. He needs the extra protection for his upper body and head that a harness with hip and shoulder straps can give." The flyer highlighted that harness seats are always the safest option and will provide safety that a booster seat cannot. This flyer was included in a 1996 safety study issued by the National Transportation Safety Board.

25.    In the early 2000s, the CDC Task Force strongly recommended that states adopt laws mandating the use of age and size appropriate child restraints. Subsequently, the NHTSA and AAP guidelines were updated with similar emphasis. The CDC has since established the following guidelines for transitioning children from one type of child restraint system to another:[7]

**Know the stages**
Make sure children are properly buckled in a car seat, booster seat, or seat belt— whichever is appropriate for their weight, height, and age.

- **Rear-facing car seat:** Birth until age 2-4.
  For the best possible protection, infants and toddlers should be buckled in a rear-facing car seat in the back seat until they reach the upper weight or height limits of their seat. Check the seat owner's manual and labels on the seat for weight and height limits.

- **Forward-facing car seat:** After outgrowing rear-facing seat and until at least age 5.
  When children outgrow their rear-facing seats, they should be buckled in a forward-facing car seat in the back seat until they reach the upper weight or height limit of their seat. Check the seat owner's manual and labels on the seat for weight and height limits.

- **Booster seat:** After outgrowing forward-facing seat and until seat belts fit properly.
  Once children outgrow their forward-facing seat, they should be buckled in a belt-positioning booster seat until seat belts fit properly. Seat belts fit properly when the lap belt lays across the upper thighs (not the stomach) and the shoulder belt lays across the chest (not the neck). Proper seat belt fit usually occurs when children are about 4 feet 9 inches tall and 9-12 years old.

---

[7] *See* https://www.cdc.gov/transportationsafety/child_passenger_safety/cps-factsheet.html.

26.    Similarly, according to the AAP, the most recent evidence-based, best practices for optimizing child passenger safety include:

a.    All infants and toddlers should ride in a rear-facing car safety seat as long as possible, until they reach the highest weight or height allowed by their car seat manufacturer. Most convertible seats have limits that will permit children to ride rear-facing for 2 years or more.

b.    All children who have outgrown the rear-facing weight or height limit for their seat should use a forward-facing seat with a harness for as long as possible, up to the highest weight or height allowed by the manufacturer.

c.    All children whose weight or height exceed the forward-facing limit for their car seat should use a belt-positioning booster seat until the vehicle lap and shoulder seat belt fits properly, typically when they have reached 4 feet, 9 inches in height and are between 8 and 12 years of age.[8]

27.    NHTSA has adopted identical guidelines for the staged progression of children through the three fundamental types of child safety restraints.[9]

28.    Since 2011, the AAP has recommended that children stay in harnessed seats "as long as possible"—that is, in most cases, until the children are 65 pounds (and in some cases up to 90 pounds).  This recommendation, based on scientific consensus, is necessary because for a booster seat to deliver a full safety benefit in a crash, an adult seat belt must, during the crash, remain on the strong parts of a child's body—i.e., across the middle of the shoulder and the upper thighs. It may not do so on smaller children, and even if young children are tall enough for a belt to reach their shoulders, they rarely sit upright for long and often wriggle out of position.

29.    By contrast, a tightly adjusted five-point harness secures a child's shoulders and hips, and goes between the legs. Harnesses secure children's bodies so that they are less likely to

---

[8] *See* Dennis R. Durbin et al., *Child Passenger Safety*, 142(5) PEDIATRICS (2018), available at https://pediatrics.aappublications.org/content/142/5/e20182460.
[9] *See* https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/documents/carseat-recommendations-for-children-by-age-size.pdf.

be ejected, and they disperse crash forces over a wider area. Harnessed seats provide more lateral support and containment for children than booster seats.

30.    Studies have compared the safety results of children in harness seats and booster seats versus children of the same age who are only wearing a seatbelt and are not in any child safety seat. Child safety seats, including car seats with harnesses, reduce the risk of injury to a child in a motor vehicle accident by 71% to 82% over a child of the same age using only a seat belt. In comparison, a booster seat only decreases the risk of injury by 45% as compared to a child of the same age just wearing a seat belt.[10]

31.    A 2009 NHTSA study recognized that "[t]he primary reasons for injuries to children restrained at the time of motor vehicle crashes" include "premature graduation from harnessed safety seats to booster seats."[11]  In 2010, NHTSA issued a report, finding that "[e]arly graduation from child restraint seats (CRS) to booster seats may also present safety risks."[12]

**B.  Efforts to Improve Safety of Car Seats and Booster Seats**

32.    In an effort to ensure that child restraint systems were protecting children from injury, states started requiring crash testing for car seats in the early 1980s.

33.    NHTSA adopted a rule setting forth certain safety standards relating to car seats and booster seats, including testing of car seats and booster seats, in its Federal Motor Vehicle

---

[10] https://pediatrics.aappublications.org/content/142/5/e20182460.

[11] *See* K.E. Will, et al., "Effectiveness of Child Passenger Safety Information For the Safe Transportation of Children," (NHTSA 2015) at 1, available at https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/812121-safe_transportation_of_children.pdf (citing Arbogast et al., "Effectiveness of belt positioning booster seats: An updated assessment" (2009) (last visited  Nov. 1, 2020)).

[12]*See* NHTSA, "Booster Seat Effectiveness Estimates Based on CDS and State Data," https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811338 (July 2010) (last visited Nov. 1, 2020).

Safety Standard ("FMVSS") No. 213, 49 C.F.R. § 471.213.  Car seats and booster seats not meeting the requirements of FMVSS No. 213 may not be sold.  Therefore, all car seats and booster seats on the market must meet the standards of FMVSS No. 213.

34.    FMVSS No. 213 does not, however, include any requirements regarding side-impact protection or side-impact testing for booster seats.

35.    In 2000, Congress directed NHTSA to "initiate a rulemaking for the purpose of improving the safety of child restraints, including minimizing head injuries from side impact collisions."[13] NHTSA did not, however, initiate any rulemaking.

36.    By 2012, NHTSA still had not issued a rule relating to side impact collisions and child restraint systems.  Congress then passed the Moving Ahead for Progress in the 21st Century Act, requiring that NHTSA amend FMVSS No. 213 within two years with a final rule "to improve the protection of children seated in child restraint systems during side impact crashes."[14]  Eight years later, NHTSA still has not issued a final rule relating to side-impact collisions and side-impact testing.

37.    While NHTSA has purportedly been working on amending FMVSS 213 to address side-impact tests, the proposed rule from 2014 would only address side-impact testing of car seats and not of booster seats.[15] As the House Subcommittee found, "[d]espite Congress urging side-impact testing standards for more than 20 years, NHTSA has failed to promulgate any such standards."[16] And, it concluded: "[I]n the absence of authoritative rulemaking by NHTSA,

---

[13] Pub. L. No. 106-414 (2000), 114 Stat. 1800.
[14] Pub. L. No. 112-141 (2012), 126 Stat. 774.
[15] *See* FMVSS, *Child Restraint Systems – Side Impact Protection*, 79 Fed. Reg. 32211 (2014).
[16] House Subcommittee Report at p. 27.

manufacturers market their car seats in ways that put children at risk of serious injury."[17]

38.    The House Subcommittee reviewed thousands of pages of previously non-public documents from the seven booster seat companies it was investigating, including Defendant Britax, before making its conclusions. Review of the documents led the House Subcommittee to conclude in its report that "[d]espite having regulatory authority over booster seats, the National Highway Traffic Safety Administration (NHTSA) has failed to regulate them in any meaningful way. … [D]espite being directed by Congress 20 years ago, [NHTSA] has not created a side-impact testing standard. The Subcommittee recommends that NHTSA fulfill its duty to regulate booster seat safety to ensure that manufacturers do not mislead parents or put children at risk in how they design and market their booster seats."[18]

39.    The House Subcommittee's report further concluded that "[m]anufacturers' misleading and dangerous practices occurred in NHTSA's willful absence of adequate federal regulation.  Though it has made mildly encouraging progress in this area, NHTSA's failure to regulate the car seat industry is all too representative of an agency that has failed time and time again to keep motorists and their families safe through regulatory delay and deregulation.  Reform is needed at all levels of NHTSA to speed up the rulemaking process and crack down on companies flouting the rules."[19]

**C.  Britax's Misleading and Deceptive Marketing of Booster Seats**

40.    Britax is a global company that has operated in the United States since 1996.[20] Britax manufactures, markets, distributes, and sells car seats and booster seats.  Britax has focused

---

[17] *Id,*
[18] *Id.* at 3.
[19] *Id.* at 32.
[20] https://us.britax.com/why-britax/history-heritage/.

its branding and marketing on safety – even naming itself "Britax Child Safety, Inc." Britax's goal is to persuade consumers that they should purchase its products – and pay a higher retail price – because, as its website states, "[a]t Britax, we are committed to improving child safety through research, testing, design and community advocacy."[21]

41.     As evidenced by its marketing emphasis on safety, Britax knows that safety is the primary factor in a parent's selection of a Booster Seat. For this reason its advertising uniformly highlights the supposed safety of its Booster Seats. Further, Britax's alleged increased safety features for side-impact collisions and its claimed side-impact testing allowed it to persuade parents that its Booster Seats have a higher market value and, therefore, Britax can charge a premium for its Booster Seats.

42.     In or around 2013, Britax launched a comprehensive nationwide advertising campaign that highlighted its claims that it gave parents peace of mind because of Britax's industry-leading safety features. The campaign used a range of tactics that included a national television spot receiving (on information and belief) tens of millions of impressions, online video, digital advertising, social media, and a robust website, which positioned Britax as an industry leader in innovative safety technology.

43.     Britax promoted its "Proudest Safety Innovations," including providing "Multiple Layers of Side Impact Protection" and testing their products in their own crash-test facilities and "through independent parties." They offered "SAFETY MADE IN USA":

---

[21] https://us.britax.com/why-britax/safety-standards/#durability.

https://us.britax.com/why-britax/safety-standards/#durability

## Our Proudest Safety Innovations



### ClickTight Installation

Our revolutionary installation system, ClickTight lets you install your car seat using just a seat belt. Plus, it gives you quick access to the belt paths, eliminating the guesswork and limits of LATCH.



### SafeCell Technology

The car seat base forms a crumple zone that absorbs crash energy to help keep it away from your baby.



### Multiple Layers of Side Impact Protection

Britax car seats offer layers of side protection, surrounding the head, neck, and torso. These layers include a deep, energy-absorbing shell, foam-lined headrest and side-impact cushions.



### V-Shaped-Tether

Designed with two attachment points to secure the seat and minimize side-to-side movement. It has rows of stitching that give-way one at a time during a crash to help slow forward movement.



We also test our products both in our own crash-test facilities and through independent parties

44.    Britax's line of booster seats includes the Britax Highpoint, Britax Midpoint, Britax Skyline, and, previously, Britax Parkway (the "Booster Seats").

45.    Currently, Britax advertises on its website that its Highpoint 2-Stage Booster is for sale at a price of $169.99.  It describes this booster seat as "pair[ing] superior safety with stylish design" and states that its "3 layers of side impact protection include an energy-absorbing shell, side cushions, & 10-position, quick-adjust headrest[.]"[22]

---

[22] https://us.britax.com/highpoint-2-stage-booster-forward-facing-only-seats/.



46.     Currently, Britax advertises on its website that its Midpoint Belt-Positioning Booster is for sale at a price of $119.99. It describes this booster seat as "combin[ing] moisture wicking fabrics and a unique breathable design to provide your child the comfort they deserve[,]" along with "[t]wo layers of side impact protection [to] help shield your child from crash forces."

47.     Currently, Britax advertises on its website that its Skyline Belt-Positioning Booster is for sale at a price of $99.99. It promises that with this booster seat "your big kid will love the comfy and stylish soft knit fabrics" and emphasizes that it comes with "[t]wo layers of side impact protection [to] help shield your child from crash forces."



48.     Although recently "retired," Britax advertised its Parkway as also having side-impact protection that "distributes crash forces, shields from vehicle intrusion, contains the head and body, and keeps the head, neck and spine 'in true' or aligned, to limit injury."

49.     Britax has consistently marketed the Booster Seats in the United States as providing "side impact protection" and ensuring that children are "surrounded in safety." Britax has even included labels on its Booster Seats representing that the seats are "side impact tested" and that they have "side impact protection."

50.     Britax also includes the representation that its Booster Seats have "side impact protection" on the boxes its Booster Seats are packaged in.



51.     The Booster Seats are marketed and sold by numerous nationwide retailers,

including Target and Walmart, as well as online via Britax's own website, Amazon, and the websites of the big box stores.

52.     To the detriment of parents and children nationwide, Britax's marketing is deceptive and misleading. There is no federal safety standard or test governing side impact testing for car seats or booster seats. Given the absence of any such standard or test, Defendant created its own test – upon information and belief, with no basis in safety or science – and then proceeded to proclaim that its Booster Seats are "side impact tested," suggesting that its Booster Seats were passing a test designed to ensure that children are kept safe when subjected to a side impact collision.

53.     Further, Britax omitted and concealed material facts about the Booster Seats from its marketing including that the touted safety features of the Booster Seats have not been shown to increase safety, that it had created its own side-impact test, and that the side-impact test was not designed to assess the booster seat's ability to protect children from injury or death in a side-impact collision.

54.     A child's head and neck are at the biggest risk during a side impact collision. Impact to the head and neck lead to serious injury or death.

55.     Britax's side-impact testing does not measure occupant *safety* nor does it focus on a child's risk of injury or death if in a side-impact collision. Instead, these tests look at occupant *retention*. Even if a booster seat retains a child during a side-impact collision, the child could still sustain serious injuries, such as paralysis from the neck down due to injury to the child's neck or head.

56.     The House Subcommittee report emphasized that when a booster seat manufacturer, like Britax, markets its booster seat as "side impact tested" and as having "side-

impact protection" features, "[a] a parent would read those claims to mean that the product increased safety by reducing the risk of injury during side-impact collision[.]" The Subcommittee further concluded, based on its review of the documents and testing information the manufacturers, including Britax, produced, that "[t]hese claims are false and misleading, as the manufacturers did not conduct testing under reasonably rigorous simulated crash conditions and did not assess for risk of injury or death."[23]

57.    The House Subcommittee concluded that Britax's claims of side-impact protection surrounding a child's head, neck and torso – claims that are included on product packaging – are "not based on any type of testing and appear[] designed to mislead consumers."[24]

58.    Upon information and belief, Britax did not provide the House Subcommittee with any evidence demonstrating that its testing established the safety of its booster seats in a side-impact collision. However, in the House Subcommittee Report, the Subcommittee pointed to a video of a crash test that it had obtained independently from Britax. While the crash test was of a harness seat, even that harness seat, which is safer than a booster seat and restrains a child more securely, demonstrated that Britax's vaunted layers of side-impact protection did not protect the child dummy's head from being "violently slammed against the door of the car as the [testing] sled decelerates . . . ."[25]

---

[23] House Subcommittee Report at 32.
[24] *Id.* at 22.
[25] *Id.* at 23.



59.     The House Subcommittee report concluded: "[T]he dummy's head is not protected by Britax's proprietary technology."[26]  If the harness seat did not hold and protect the child dummy from "violently slam[ing]" its head, then there can be no question that the booster seat would equally fail to pass a test designed to accurately assess whether the booster seat protects a child in a side-impact collision.

60.     No parent would have purchased the Booster Seats or have paid the current retail price for the Booster Seat if Britax had truthfully disclosed and reported that the safety features it designed and advertised are not actually proven to safeguard children. Parents who have purchased the Booster Seats have not received what they were promised and were willing to pay for.  They thought they were paying for side-impact protection that Britax had proven through testing would

---

[26] *Id.*

substantially reduce the risk of injury or death to their children if in a side-impact collision. They paid for a safer booster seat but did not get one.

1-1 of 3 Reviews Sort By Most Relevant Filter By Photos Rating

JenH
Hawaii

★★★★★ February 5, 2019

**Midpoint for the win**

I recently moved my five year old twins from toddler car seats to the Midpoint. They transitioned seamlessly. They love their "big boy" seats and so do I. We have had the seats for a couple weeks and they are learning how to buckle themselves in. They have napped in the Midpoint comfortably, without falling forward. The installation was easy and the instructions were through. My three year old can't wait to move into one. I highly recommend the Midpoint when transitioning from a toddler car seat.

Yes, I recommend this product.

Impact protection
Ease of Use
Overall Comfort
Appearance
Value of Product

62. Reviews published on Britax's website show how the marketing claims of side-impact protection are perceived and that they matter to consumers.

I received a Britax Skyline 2 stage Booster Seat from Stellar Parent Product Testing Panel. Soon as I opened the box, my daughter was very excited and said it was beautiful. She was thrilled to try out a big girl seat. I tried both modes for the Booster seat with the back and backless. It required a gentle hit to click the back into place. This Britax boosterseat is super lightweight making it very easy to transfer to another car. I liked the color coded belt paths, it made it easy to make sure I installed it correctly. Installation was a breeze. my daughter said she loved the 2 cup holders! all our other seats we have had only have 1, so 2 is great for holding drinks and snacks. The back seems very upright but my daughter said it was comfortable. It does not take up much space in the back of the car so there is plenty of room between our 2 carseats for the kids car activity box. I like that there are 2 layers of side impact protection and plenty of comfortable padding. I enjoy how the headrest has 10 different positions to grow with your child. Overall this is a great user friendly, safety featured, light weight, kid approved booster seat. I would recommend this boosterseat to other parents.

✅ Yes, I recommend this product.

I have loved using the Britax Skyline 2-Stage Booster Seat for my 7 year old. Set up was a breeze! It seriously took me 30 seconds to attach the back to the base. It is just as easy to make this a backless booster again. The color coded belt path is so simple as well. The belt goes through a red shoulder height adjuster then along a red lap belt path. It simply utilizes the latch system in my car and then my daughter can buckle herself in easily with the seat belt. It's so easy to adjust to fit the child's height and once she sat down in 10 seconds I had the back height adjusted for her. I also love how safe it is. My favorite safety features is the side impact protection. My daughter specifically loves the cup holders and the head support because she can rest comfortably on longer rides. Initially my only concern was that the back felt a little loose, but once she is buckled in it does not seem to compromise any aspect of safety. I had kept my daughter in a 5 point seat for a very long time and this seat finally puts my mind at ease in allowing her to use a booster instead. I received this product as part of the Stellar Product Testing Panel.

✅ Yes, I recommend this product.

**D. Britax had the Opportunity to Give Complete and Truthful Information, but Instead Continued its Omissions and Deceptions**

63.     From well before and throughout the Class Period, Britax has advertised its booster seats throughout the United States with pervasive material messages keyed on their safety and their (now known to be fraudulent) side-impact testing regimen. At any time and in any of these advertisements, Britax could have provided complete and accurate information about the safety of the booster seats. But Britax chose not to do so.

64.     Even after the Subcommittee Report, Britax has continued to advertise that its Booster Seats have special side-impact protection when it has no evidence that this supposedly proprietary protection is effective.  It has also continued to claim that its Booster Seats are side-impact tested, insinuating that Britax has confirmed, through testing, that its Booster Seats will protect children in a side-impact collision.

65.     All booster seats must meet the government standards, but to justify the increased price that purchasers of Britax Booster Seats pay for the products, Britax must distinguish its Booster Seats from lower-priced competitors.  Contrary to its marketing promises, Britax fails to provide purchasers any more protection than the booster seats of other manufacturers.

66.     Further, even after the House Subcommittee Report, and Britax's own internal knowledge that its representation that its booster seats are "side impact tested" is deceptive and misleading, Britax has failed to stop advertising its booster seats as "side impact tested" in its marketing materials, on the boxes of its Booster Seats, and in the stitched label on the booster seats.







67.     Had Britax disclosed the results of its side-impact testing to the public, the market value of the Britax Booster Seats would have been substantially less. As a result, parents and guardians may not have purchased a Britax Booster Seat at all, either because of the unwillingness to pay the price Britax was charging or because of a desire to keep children safe by having them remain in a harness seat.

68.     Rather than accept mainstream science—including both the AAP's and NHTSA's recommendations regarding child safety—Britax has spent more than a decade maximizing its profits by waging a disinformation campaign against parents and guardians, relentlessly telling them that its Booster Seats have special, proprietary side-impact protection that has validated through "side-impact testing."

69.     The result of this conduct is that, in reliance on Britax's material

misrepresentations and omissions regarding the safety of their seats, parents and guardians have through the years substantially increased Britax's sales by purchasing Britax's Booster Seats in the mistaken belief that they are purchasing for their children protection from injury in side-impact crashes.

## **PLAINTIFFS' FACTS**

70.     In April 2020, Plaintiff Tiffany Coleman bought two Britax USA Highpoint 2-Stage Belt-Positioning Booster Car Seat from amazon.com for her six and nine year old daughters.

71.     Plaintiff Coleman paid $159.99 for each booster seat.

72.     In comparison to the cost of other, comparable booster seats, Plaintiff Coleman paid a premium to purchase a Britax Booster Seat.

73.     Plaintiff Coleman decided to buy these booster seats based in part on Britax's representations that it was "safe" for children, had "layers of side impact protection," and it was "side impact tested." Plaintiff Coleman also decided to buy the Britax Booster Seats because she viewed Britax's reputation as a company who cared about safety.

74.     As a reasonable consumer, Plaintiff Coleman perceived Britax's representations regarding side-impact testing as an indication that the Booster Seats she was purchasing had succeeded under safety testing standards beyond those required by the government, when, in fact, they did not.

75.     Plaintiff Coleman's decision to purchase these Booster Seats was directly impacted by Defendant's representations regarding its "side impact testing" and "layers of side impact protection" purportedly part of the Booster Seats.

76.     Had Plaintiff Coleman known the truth about Britax's lack of side-impact protection and the lack of legitimate side-impact testing she would either have not purchased the

Booster Seats or she would have paid less for the Booster Seats – she would have paid only an amount equal to the actual market value of the Booster Seats.

77.    Plaintiff Coleman would like to purchase Defendant Britax's Booster Seats in the future if they truly did provide side-impact protection and were side-impact tested to ensure that the Booster Seats protected children from injury or death in a side-impact collision. Plaintiff Coleman is, however, unable to rely on Defendant Britax's representations regarding the safety and testing of its Booster Seats in deciding whether to purchase Defendant Britax's Booster Seats in the future.

78.    In November 2020, Plaintiff Keli Swann bought a Britax Skyline 2-Stage Belt-Positioning Booster Car Seat from Target in Raleigh, North Carolina for her son.

79.    Plaintiff Swann paid approximately $100 for the booster seat.

80.    In comparison to the cost of other, comparable booster seats, Plaintiff Swann paid a premium to purchase a Britax booster seat.

81.    Plaintiff Swann decided to buy the Booster Seat based in part on Britax's representations that it was "safe" for children, had "layers of side impact protection," and it was "side impact tested." Plaintiff Swann also decided to buy the Britax Booster Seats because she viewed Britax's reputation as a company who cared about safety.

82.    As a reasonable consumer, Plaintiff Swann perceived Britax's representations regarding side-impact testing as an indication that the Booster Seats she was purchasing had succeeded under safety testing standards beyond those required by the government, when, in fact, they did not.

83.    Plaintiff Swann's decision to purchase these Booster Seats was directly impacted by Defendant's representations regarding its supposedly rigorous side-impact testing.

84.     Had Plaintiff Swann known the truth about Britax's lack of side-impact protection and the lack of legitimate side-impact testing she would either have not purchased the Booster Seats or she would have paid less for the Booster Seats – she would have paid only an amount equal to the actual market value of the Booster Seats.

85.     Plaintiff Swann would like to purchase Defendant Britax's Booster Seats in the future if they truly did provide side-impact protection and were side-impact tested to ensure that the Booster Seats protected children from injury or death in a side-impact collision. Plaintiff Swann is, however, unable to rely on Defendant Britax's representations regarding the safety and testing of its Booster Seats in deciding whether to purchase Defendant Britax's Booster Seats in the future.

86.     In October 2017, Plaintiff Heather Brooke bought two Britax Parkway SGL G1.1 Belt-Positioning Booster Seats for her children from amazon.com.

87.     Plaintiff Brooke paid $103.00 for each booster seat.

88.     In comparison to the cost of other, comparable booster seats, Plaintiff Brooke paid a premium to purchase a Britax Booster Seat.

89.     Plaintiff Brooke decided to buy these Booster Seats based in part on Britax's representations that they were "safe" for children, had "layers of side impact protection," and they were "side impact tested." Plaintiff Brooke also decided to buy the Britax Booster Seats because she viewed Britax's reputation as a company who cared about safety.

90.     As a reasonable consumer, Plaintiff Brooke perceived Britax's representations regarding side-impact testing as an indication that the Booster Seats she was purchasing had succeeded under safety testing standards beyond those required by the government, when, in fact, they did not.

91.     Plaintiff Brooke's decision to purchase these Booster Seats was directly impacted

by Defendant's representations regarding its "side impact testing" and "layers of side impact protection" purportedly part of the Booster Seats.

92.    Had Plaintiff Brooke known the truth about Britax's lack of side-impact protection and the lack of legitimate side-impact testing she would either have not purchased the Booster Seats or she would have paid less for the Booster Seats – she would have paid only an amount equal to the actual market value of the Booster Seats.

93.    Plaintiff Brooke would like to purchase Defendant Britax's Booster Seats in the future if they truly did provide side-impact protection and were side-impact tested to ensure that the Booster Seats protected children from injury or death in a side-impact collision. Plaintiff Brooke is, however, unable to rely on Defendant Britax's representations regarding the safety and testing of its Booster Seats in deciding whether to purchase Defendant Britax's Booster Seats in the future.

## **TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

94.    Britax has had actual knowledge for several years that the marketing, packaging, and labeling of its Booster Seats was deceptive and misleading because it knows that its side-impact protection is not providing protection and its side-impact testing is not testing for injury or death.

**Discovery Rule Tolling**

95.    During the period of any applicable statutes of limitation, Plaintiffs and other Class members, through the exercise of reasonable diligence, could not have discovered Britax's wrongdoing. Britax concealed and misrepresented the true nature of the Booster Seats and its side-impact testing.

96.    Plaintiffs and Class Members did not discover, and did not have knowledge of, facts that would cause a reasonable person to suspect that Defendant's Booster Seat does not provide additional protection in side-impact collision scenarios, or that Defendant's marketing, packaging, and labeling of the Booster Seat as "side impact tested" was false, deceptive, and/or misleading.

97.    Until recently, Britax was able to conceal the fact that it knew its Booster Seats do not provide side-impact protection to children and that their testing in fact did not establish the effectiveness of its side-impact protection measures.  Plaintiffs, Class Members, and the public at-large had no way of knowing these material facts until the House Subcommittee published its report on December 10, 2020.

98.    Plaintiffs and Class Members could not have reasonably discovered the true extent of Britax's illegal conduct until the House Subcommittee published its findings publicly. Nor could Plaintiffs and other Class members have known of facts that would have caused a reasonable person to suspect that Britax knowingly failed to disclose to United States consumers material information about the lack of side-impact protection in its Booster Seats or the inadequacy of its testing and touted safety features.

99.    For the foregoing reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule.

**Fraudulent Concealment Tolling**

100.    All applicable statutes of limitation have also been told by Britax's fraudulent concealment throughout the period relevant to this action of its internal testing.

101.    Instead of disclosing to consumers that it has no evidence that its purported layers of side-impact protection in fact protect children in a side-impact collision and that it does not

adequately test the Booster Seats to determine whether children will be safe in a side-impact collision, Britax continued to manufacture and sell these seats without disclosing this information. Instead, it affirmatively misrepresented the seats were "side impact tested."

**Estoppel**

102.     Britax was under a continuous duty to disclose to Plaintiffs and other Class members that it does not have evidence that its purported side-impact protection in fact provides protection in the event of a side-impact collision.

103.     Britax knowingly, affirmatively, and actively concealed the fact that it had no evidence that its purported side-impact protection worked and meanwhile affirmatively misrepresented the Booster Seats as "side impact tested."

104.     Based on the foregoing, Britax is estopped from relying on any statutes of limitations in defense of this action.

<u>**CLASS ACTION ALLEGATIONS**</u>

105.     Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Rules 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Nationwide Class") and subclasses (the "State Subclasses"):

**Nationwide Class:** All persons within the United States who purchased a Britax Booster Seat between 2008 and present.

**North Carolina Subclass**: All persons in the state of North Carolina who purchased a Britax Booster Seat between 2008 and present.

**Indiana Subclass**: All persons in the state of Indiana who purchased a Britax Booster Seat between 2008 and present.

**Florida Subclass:** All persons in the state of Florida who purchased a Britax Booster Seat between 2008 and present.

106.     Excluded from the Classes are Defendant and any entities in which Defendant or

its parents, subsidiaries or affiliates have a controlling interest, and Defendant's officers, agents, and employees. Also excluded from the Classes are the judge assigned to this action, members of the judge's staff, and any member of the judge's immediate family.

107.    Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Class should be narrowed, expanded, or otherwise modified.

108.    **Numerosity**. Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. During the Class Period, millions of Britax Booster Seats were sold to millions of individual customers. Class members are readily identifiable from information and records in the possession of Britax and third-party merchants like Amazon, Target, Walmart, Kmart, Costco, and Babies R Us.

109.    **Commonality and Predominance.** Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Britax acted on grounds generally applicable to the entire Class, thereby making damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in Britax's wrongful actions. Questions of law and fact common to the Class include, but are not limited to:

a.    Whether Britax owed a duty of care to Plaintiffs and members of the Classes;

b.    Whether Britax was negligent or grossly negligent in representing the Booster Seats were side-impact tested and have side-impact protection;

c.    Whether Britax represented through advertising, marketing, and labeling that the Booster Seats were safe for child occupants in a side-impact crash;

32

d.      Whether Britax acted to conceal that its Booster Seats' side-impact protection did not protect children and that its side-impact testing did not test for injury or death in side-impact collisions;

e.      Whether Britax's failure to disclose the lack of side-impact protection or the fact that its side-impact testing did not test for injury or death was unfair, deceptive, fraudulent, or unconscionable;

f.      Whether Britax's representations and/or omissions in advertising, marketing, and labeling are likely to mislead a reasonable consumer;

g.      Whether Britax knew that its representations and/or omissions in advertising, marketing, and labeling were false, deceptive, or misleading;

h.      Whether Britax engaged in unlawful, fraudulent, or unfair business practices;

i.      Whether Britax violated statutes and/or common law as described herein;

j.      Whether Britax was unjustly enriched at the expense of Plaintiffs and Class Members;

k.      Whether Britax should be ordered to disgorge all or part of the ill-gotten profits it received from the sales of the Booster Seats;

l.      Whether Britax breached express warranties to Plaintiffs and Class Members;

m.      Whether Plaintiffs and the other Class members are entitled to damages, and in what amount; and

n.      Whether Plaintiffs and the other Class members are entitled to declaratory

or injunctive relief.

110.    **Typicality**. Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs and the other Class members were injured through the substantially uniform misconduct by Britax. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and of other Class members arise from the same operative facts and are based on the same legal theories.

111.    **Adequacy of Representation.** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class members they seeks to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation and Plaintiffs will prosecute this action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

112.    **Declaratory and Injunctive Relief**. Britax will continue to commit the unlawful practices alleged herein, and Class Members will remain at risk as a result of the Booster Seats' lack of side-impact protection and the lack of legitimate side-impact testing. Britax has acted or refused to act on grounds generally applicable to Plaintiffs and the other Members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as requested in the Prayer for Relief below, with respect to the Members of the Classes as a whole.

113.    **Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the other members of the Class are relatively small compared to the burden and expense that would be required to litigate their claims

on an individual basis against Britax, making it impracticable for Class members to individually seek redress for Britax's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

114.    Further, Britax has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

115.    Likewise, particular issues under Rule 23(c)(4) of the Federal Rules of Civil Procedure are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, those set forth above.

### CAUSES OF ACTION

**COUNT I**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**15 U.S.C. § 2301, et seq.**
**(On Behalf of Plaintiffs and the Nationwide Class)**

116.    Plaintiffs bring this count on behalf of themselves and members of the Nationwide Class.

117.    The sale of the Booster Seats was subject to the provisions and regulations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*.

118. The Booster Seats are "consumer products" as defined in the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

119. Plaintiffs and the other Nationwide Class members are "consumers" as defined by the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

120. Britax is a "supplier" and "warrantor" as defined by the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4)-(5).

121. The Booster Seats' implied warranties are covered by the Magnuson- Moss Warranty Act, 15 U.S.C. § 2301(7).

122. Britax breached these warranties, as further described above, by not disclosing the true nature of the Booster Seats, and by providing the Booster Seats not in merchantable condition and not fit for the ordinary purpose for which they are used. They are also not fit for the specific purposes for which Britax sold them and for which Class members purchased and/or owned them.

123. Privity is not required in this case because Plaintiffs and the other Class members are intended third-party beneficiaries of contracts between Defendant and those who sell its products; specifically, they are the intended beneficiaries of Britax's express and implied warranties. The vendors were not intended to be the ultimate consumers of the Booster Seats and have no rights under the warranty agreements provided with the Booster Seats; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because the Booster Seats are dangerous instrumentalities due to the unsafe nature for children in side-impact crashes.

124. Requiring an informal dispute settlement procedure, or affording Britax a reasonable opportunity to cure its breach of written warranties, is unnecessary and futile. Britax knew, should have known, or was reckless in not knowing, of its misrepresentations concerning

the Booster Seats, but nonetheless failed to rectify the situation and/or disclose the truth. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement – whether under the Magnuson-Moss Warranty Act or otherwise – that Plaintiffs resort to an informal dispute resolution procedure and/or afford Britax a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

125.    Plaintiffs and the other Class members have been damaged as a result of the wrongful conduct complained of herein. Said conduct continues, and the harm or risk of harm is ongoing.

126.    There are more than 100 class members. The amount in controversy also exceeds the statutory minimums set forth at 15 U.S.C. § 2310(d)(3). Each Class member's individual claim is equal to or larger than $25 and the cumulative amount in controversy (excluding interest and costs) exceeds $50,000.

127.    As a result of Britax's violations of the Magnuson-Moss Warranty Act and warranties with consumers, Plaintiffs and the other members of the Class have been damaged in an amount to be determined at trial.

**COUNT II**
**FRAUDULENT MISREPRESENTATION**
**(On Behalf of Plaintiffs and the Nationwide Class and, in the Alternative, the State Subclasses)**

128.    Plaintiffs assert this claim for common law fraud on an affirmative misrepresentation theory on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses, against Britax.

129.    As detailed above, Britax made false or misleading statements to Plaintiffs and Class members regarding the safety of the Booster Seats, including the side-impact testing. These

misrepresentations include: Misrepresenting that the Booster Seats are "side impact tested" and provide side-impact protection.

130.    Britax made these statements through, among other things, stitching/labels on the Booster Seats and on the packaging that described the equipment and features of the Booster Seats, and in the owners' manuals, warranty booklets, product brochures, advertisements, and other promotional materials for the Booster Seats.

131.    Britax's representations were false and misleading because Britax has no evidence that the Booster Seats' side-impact protection feature provides protection children in side-impact collisions and Britax's side-impact testing does not test for occupant safety, injury, or death.

132.    Britax knew the representations were false and intended that Plaintiffs and Class members rely on them.

133.    These misrepresentations were material to Plaintiffs' and Class members' decision to acquire the Booster Seats.

134.    Plaintiffs and members of the Nationwide Class and the State Subclasses justifiably relied on Britax's misrepresentations of material facts regarding the Booster Seats, as described above.

135.    Each Plaintiff decided to purchase a Booster Seat based in part on Britax's representations regarding the safety of the Booster Seats and the specifications.

136.    Britax's conduct showed malice, motive, and a reckless disregard of the truth such that an award of punitive damages is appropriate. Because Britax's deceptive and unfair conduct is ongoing, injunctive relief is necessary and proper.

**COUNT III**
**FRAUDULENT CONCEALMENT**
**(On Behalf of Plaintiffs and the Nationwide Class and, in the Alternative, the State Subclasses)**

137.    Plaintiffs assert this claim for common law fraud on a concealment theory on behalf of themselves and members of the Nationwide Class and the State Subclasses.

138.    Britax made pervasive and consistent statements regarding the safety of the Booster Seats and the specifications that concealed, suppressed, omitted, and failed to disclose material facts necessary to make those statements not misleading.  As detailed above, Britax's statements describing the equipment and features of the Booster Seats in labels, packaging, owners' manuals, warranty booklets, product brochures, advertisements, and other promotional materials for the Booster Seats.  These statements represented that the Booster Seats were side-impact tested and provided side-impact protection, met or exceeded U.S. safety standards, and were subjected to crash tests, such that the Booster Seats would properly protect intended users in a side-impact crash.

139.    Britax knowingly, willfully, fraudulently, and/or recklessly concealed and suppressed material facts regarding the Booster Seats, including: (a) the Booster Seats' side-impact protection feature fails to provide protection in a side-impact collision and (b) Britax's side-impact testing does not test for occupant safety, injury, or death. Thus, Britax knowingly, willfully, fraudulently, and/or recklessly concealed that the Booster Seats would not properly protect an intended user during a crash.

140.    These concealed and suppressed facts were material because a reasonable consumer would have expected that a side-impact tested Booster Seat designed for children would properly protect intended users during a crash and that Britax's testing had demonstrated that fact.

141.    A reasonable consumer would rely on those facts in deciding whether to purchase a Booster Seat. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

142.    Plaintiffs and Class Members did not know that their Booster Seats would not properly protect intended users during a crash nor that the Booster Seats did not meet federal side-impact safety testing. Nor could Plaintiffs and Class Members have discovered these concealed facts through reasonably diligent investigation.

143.    Britax has a duty to disclose the truth regarding the safety of its Booster Seats, because the safety of the Booster Seats has a direct impact on the health and safety of the children who occupy them. This duty arose from the fact that Britax:

    i.    Had exclusive and/or far superior knowledge and access to the material, suppressed facts regarding the Booster Seat testing and lack thereof;

    ii.    Affirmatively and intentionally concealed the material facts from Plaintiffs and Class Members; and

    iii.    Knew that the nature of the side-impact testing and lack of evidence of the effectiveness of the purported side-impact protection were material facts that would affect Plaintiffs' and Class Members' decisions to buy a Booster Seat.

144.    Each Plaintiff decided to buy a Booster Seat based in part on Britax's representations as to the safety, testing, and specifications of the Booster Seats.

145.    The facts Britax omitted to disclose were material to Plaintiffs and members of the Nationwide Class and the State Subclasses when they purchased the Booster Seats.

146.    Britax intended that its omissions of material fact would deceive or mislead Plaintiffs and members of the Nationwide class and the State Subclasses and induce them to

purchase its Booster Seat.

147. Plaintiffs and members of the Nationwide Class and the State Subclasses justifiably relied on Britax's omissions of material facts regarding the Booster Seats, as described above.

148. Britax's omissions of material facts directly and proximately caused the damages suffered by Plaintiffs and members of the Nationwide Class and the State Subclasses. As a result of Britax's omissions of material facts, Plaintiffs and members of the Nationwide Class and the State Subclasses have been damaged in an amount to be proven at trial.

149. Britax's conduct showed malice, motive, and a reckless disregard of the truth such that an award of punitive damages is appropriate.

150. Because Britax's deceptive and unfair conduct is ongoing, injunctive relief is necessary and proper.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Nationwide Class and, in the Alternative, the State Subclasses)**

151. Plaintiffs bring this count on behalf of themselves and members of the Nationwide Class and the State Subclasses.

152. Britax knowingly accepted and enjoyed the benefits of Plaintiffs and Class members purchasing or causing the purchase of Booster Seats.

153. Britax should not be able to retain the benefit of the funds paid because the members of the Classes rendered payment with the expectation that the booster seats would be as represented and warranted—a well-designed product that was thoroughly tested and provided side impact protection in a side-impact car crash.

154.     Britax misrepresented and omitted material facts regarding the actual dangers posed by Britax's booster seat, the meaningless side-impact testing of the booster seats, and the illusory protection provided by the booster seats in a side-impact car crash. Through those misrepresentations and omissions, the Plaintiffs and members of the Classes purchased the booster seats through which Britax profited.

155.     Equity dictates that Britax's ill-gotten gains be disgorged, and that the Plaintiffs and members of the Classes are entitled to restitution.

## COUNT V
## NEGLIGENT MISREPRESENTATION
### (On Behalf of Plaintiffs and the Nationwide Class and, in the Alternative, the State Subclasses)

156.     Plaintiffs bring this count on behalf of themselves and members of the Nationwide Class and the State Subclasses.

157.     During the Class Period, Britax represented to the public in its websites, marketing materials, and packaging of the booster seats that the products were safe, side-impact tested, and provided side-impact protection in side-impact car crashes.

158.     Britax's representations were material to the purchasing decisions of Plaintiffs and Class members.

159.     Plaintiffs relied on Britax's misrepresentations in purchasing and using the Booster Seats.

160.     At the time of sale, Britax should have known that these representations about the Booster Seats were false.

161.     Based on these representations of material fact, Britax had a duty to disclose the truth about the characteristics of the Booster Seats and the lack of any federal side-impact testing

standards. Despite this duty, Britax failed to exercise reasonable care or competence in communicating information regarding the fact that the side-impact testing failed to test for injury or death and that the side-impact protection did not protect children to Plaintiffs and Class members.

162.    These misrepresentations were made uniformly to the consuming public, including the members of the Classes. Plaintiffs and members of the Classes relied on Britax's misrepresentations, and would not have purchased and/or owned a Booster Seat had Britax not made the misrepresentations about its design, safety and testing.

163.    As a result of Britax's negligent misrepresentations concerning the Booster Seat, Plaintiffs and members of the Classes have been damaged.

**COUNT VI**
**VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**
**(N.C. Gen. Stat. §§ 75-1.1, *et seq.* )**

164.    Plaintiff Keli Swann ("North Carolina Plaintiff") brings this count against Britax on behalf of herself and the North Carolina Subclass.

165.    Britax's foregoing acts and practices, including its omissions in the conduct of trade or commerce, were directed at consumers.

166.    Britax engaged in "commerce" as defined in N.C. Gen. Stat. § 75-1.1(b).

167.    Britax's foregoing deceptive acts and practices, including its omissions, were material, in part, because they concerned an essential part of the Booster Seats' intended use and provision of safety to children. Britax omitted material facts regarding the safety (or lack thereof) of the Booster Seats by failing to disclose the results of its internal side-impact testing, that its side-impact testing does not test for injury or death, and that Britax has no evidence that the "layers

of side impact protection" protect the children. Rather than disclose this information, Britax marketed and labeled the Booster Seats as "side-impact tested" and misrepresented that the Booster Seats have side-impact protection.

168.    Despite Britax's representation that the Booster Seats are "side-impact tested," the side-impact testing does not test for occupant safety, injury, or death.

169.    Britax did not disclose this information to consumers.

170.    Britax willfully failed to disclose the safety risks of Britax's Booster Seats.

171.    Britax knew or should have known that its conduct violated the North Carolina Act.

172.    Britax's foregoing deceptive acts and practices, including its omissions while engaged in business, were and are deceptive acts or practices in violation of N.C. Gen. Stat. §§ 75-1.1, et seq., in that:

    a.    Britax manufactured, labeled, packaged, marketed, advertised, distributed, and/or sold the Booster Seats as "side impact tested," when, through its own internal side-impact testing it knew, or should have known, that the Booster Seats were not tested for occupant safety, injury, or death and that its Booster Seats failed to provide side-impact protection;

    b.    Britax knew that the testing measures and the results of its own internal side-impact testing were unknown to and would not be easily discovered by North Carolina Plaintiff and North Carolina Subclass members, and would defeat their ordinary, foreseeable and reasonable expectations concerning the performance of the Booster Seats;

    c.    North Carolina Plaintiff and North Carolina Subclass members were deceived by Britax's failure to disclose and could not discover the testing measures or results;

    d.    Britax knew that the unreasonable risk to the safety of children was unknown to and would not be easily discovered by North Carolina Plaintiff and North Carolina Subclass members, and would defeat their ordinary, foreseeable and reasonable expectations concerning the performance of the Booster Seats; and

e.   North Carolina Plaintiff and North Carolina Subclass members were deceived by Britax's failure to disclose and could not discover the lack of protection from the side-impact protection features and the testing measures and results.

173.   North Carolina Plaintiff and North Carolina Subclass members suffered damages when they purchased the Booster Seats. Britax's unconscionable, deceptive and/or unfair practices caused actual damages to North Carolina Plaintiff and the North Carolina Subclass members who were unaware that the Booster Seats posed an unreasonable safety risk to children in the event of a side-impact collision, notwithstanding Britax's representations at the time of purchase.

174.   Britax's foregoing deceptive acts and practices, including its omissions, were likely to deceive, and did deceive, consumers acting reasonably under the circumstances.

175.   Consumers, including North Carolina Plaintiff and North Carolina Subclass members, would not have purchased the Booster Seats or the market value of the Booster Seats would have been less had they known about the lack of side-impact protection or the measures and results of Defendant's internal side-impact testing.

176.   As a direct and proximate result of Britax's deceptive acts and practices, including its omissions, North Carolina Plaintiff and North Carolina Subclass members have been damaged as alleged herein, and are entitled to recover actual damages and/or treble damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

177.   In addition, North Carolina Plaintiff and North Carolina Subclass members seek equitable and injunctive relief against Britax on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

## COUNT VII
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.C. Gen. Stat. § 25-2-314)

178.     This claim is brought by Plaintiff Keli Swann ("North Carolina Plaintiff") against Britax on behalf of herself and the North Carolina Subclass.

179.     North Carolina law states that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.C. Gen. Stat. § 25-2-314(1).

180.     Britax is and was at all relevant times a "merchant" as defined by N.C. Gen. Stat. § 25-2-104(1).

181.     North Carolina Plaintiff and members of the North Carolina Subclass purchased Booster Seats manufactured and marketed by Britax by and through its authorized sellers for retail sale to consumers, or were otherwise expected to be the third-party beneficiaries of Britax's contracts with authorized sellers, or eventual purchasers when bought from a third party. At all relevant times, Britax was a merchant, manufacturer, marketer, warrantor, and/or seller of the Booster Seats. Britax knew or had reason to know of the specific use for which the Booster Seats were purchased.

182.     The Booster Seats are and were at all relevant times goods within the meaning of N.C. Gen. Stat. § 25-2-105(1).

183.     Britax impliedly warranted that the Booster Seats were in merchantable condition and fit. However, when sold, and at all times thereafter, the Booster Seats were not in merchantable condition and were not fit for the ordinary purpose of providing protection for children in the event of a side-impact crash. Thus, Britax breached its implied warranty of merchantability for the ordinary purpose for which the Booster Seats are purchased and used.

184.    Britax cannot disclaim its implied warranty as it knowingly sold unsafe and hazardous booster seats.

185.    Britax was provided written notice prior to the filing of the action. Affording Britax a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because Britax knew of and concealed the safety risks linked to the Booster Seats.

186.    As a direct and proximate result of Britax's breach of the implied warranty of merchantability, North Carolina Plaintiff and members of the North Carolina Subclass have been damaged in an amount to be proven at trial.

187.    North Carolina Plaintiff and members of the North Carolina Subclass have been excused from performance of any warranty obligations as a result of Britax's conduct described herein.

## COUNT VIII
## VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT ("IDCSA")
### (Ind. Code § 24-5-0.5-1, *et seq.*)

188.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

189.    This count is brought by Plaintiff Tiffany Coleman ("Indiana Plaintiff" for purposes of this count), on behalf of herself and members of the Indiana Subclass.

190.    Britax is a "person" as defined by Ind. Code § 24-5-0.5-2(a)(2).

191.    Britax is a "supplier" as defined by Ind. Code § 24-5-0.5-2(a)(3)(A) and regularly engages in or solicits "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2(a)(1).

192.    Britax received notice from Plaintiff pursuant to Ind. Code § 24-5-0.5-5 concerning its wrongful conduct as alleged herein.

193. Britax engaged in unfair, abusive, and deceptive acts, omissions, and practices in connection with consumer transactions, in violation of Ind. Code § 24-5-0.5-3.

194. Prohibited deceptive acts in violation of Indiana Code § 24-5-0.5-3, include, but are not limited to: (a) misrepresenting that the subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have; and (b) misrepresenting that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not.

195. Britax engaged in deceptive practices that violated the IDCSA by knowingly making misleading statements about the features of its booster seats and knowingly failing to disclose the testing measures and results of its side-impact testing, including that its side-impact testing did not test for occupant safety, injury, or death.

196. For example, Britax falsely and misleadingly represented that its booster seats were "Side Impact Tested" and had "layers of side impact protection." Britax also failed to disclose material facts, including but not limited to the following: (1) the Booster Seats' side-impact protection feature fails to protect and (2) Britax's side-impact testing does not test for occupant safety, injury, or death.

197. Britax's acts and practices were "unfair" because they caused or were likely to cause substantial injury to consumers, which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

198. The injury to consumers from Britax's conduct was and is substantial because it was non-trivial and non-speculative and involved a monetary injury. The injury to consumers was substantial not only because it inflicted harm on a significant number of consumers, but also

48

because it inflicted a significant amount of harm on each consumer.

199.    Consumers could not have reasonably avoided injury because Britax's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers about the side-impact protection feature and lack of legitimate side-impact testing of Britax's Booster Seats, Britax created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

200.    Britax's business practices, in concealing material information or misrepresenting the qualities, characteristics, and performance of its Booster Seats had no countervailing benefit to consumers or to competition.

201.    Britax's acts and practices were also "abusive" for numerous reasons, including: (a) because they materially interfered with consumers' ability to understand a term or condition in a consumer transaction, interfering with consumers' decision-making; (b) because they took unreasonable advantage of consumers' lack of understanding about the material risks, costs, or conditions of a consumer transaction; consumers lacked an understanding of the material risks and costs of a variety of their transactions; (c) because they took unreasonable advantage of consumers' inability to protect their own interests; consumers could not protect their interests due to the asymmetry in information between them and Britax; and (d) because Britax took unreasonable advantage of consumers' reasonable reliance that it was providing truthful and accurate information.

202.    Britax intentionally and knowingly misrepresented and failed to disclose material facts it had a duty to disclose regarding its Booster Seats with intent to mislead Indiana Plaintiff and the Indiana Subclass.

49

203.    Britax's omissions and/or misrepresentations about the side-impact protection feature and side-impact testing of its Booster Seats were material to Indiana Plaintiff and the Indiana Subclass because they were likely to deceive reasonable consumers. Indiana Plaintiff and Indiana Class members relied on Britax's material misrepresentations and omissions regarding the safety of Britax's Booster Seats.

204.    Britax owed Indiana Plaintiff and the Indiana Subclass a duty to disclose material facts about the safety risks posed by its Booster Seats, because Britax:

a) Possessed exclusive knowledge about its testing of these seats;

b) Intentionally concealed the foregoing from Indiana Plaintiff and the Indiana Subclass; and/or

c) Made incomplete and misleading representations that its booster seats were "Side Impact Tested," while purposefully withholding material facts from Indiana Plaintiff and the Indiana Subclass that contradicted these representations.

205.    Britax had a duty to disclose the truth about the safety risks posed by its booster seats because these seats put children's health and well-being at serious risk in side-impact car crashes.

206.    Indiana Plaintiff and absent Indiana Subclass members had unequal bargaining power with respect to their purchase and/or use of Booster Seats because of Britax's omissions and misrepresentations.

207.    Indiana Plaintiff and members of the Indiana Subclass could not have discovered through the exercise of reasonable diligence that Britax's Booster Seats' side-impact protection feature provided no protection and that Britax's side-impact testing did not test for occupant safety, injury, or death.. Indiana Plaintiff and Indiana Subclass members acted reasonably in relying on

Britax's misrepresentations and omissions, the truth of which they could not have discovered.

208.    Had Britax disclosed to Indiana Plaintiff and Indiana Subclass members material facts, including but not limited to, the lack of side-impact protection from the side-impact protection features and the lack of legitimate side-impact testing, Indiana Plaintiff and the Indiana Subclass members would not have purchased Britax's Booster Seats and/or the market value of the Booster Seat would have been lower. Instead, Britax kept these tests secret, and embarked on a disinformation campaign aimed at convincing millions that its Booster Seats are safe.

209.    Britax's deceptive, unfair, and abusive acts or practices were likely to and did in fact deceive reasonable consumers, including Indiana Plaintiff and the Indiana Subclass members, about its Booster Seats.

210.    Britax had an ongoing duty to all Britax customers to refrain from deceptive, unfair, and abusive acts and practices under the IDCSA.

211.    Britax acted intentionally, knowingly, and maliciously to violate IDCSA, and recklessly disregarded Indiana Plaintiff's and Indiana Subclass members' rights. Britax's knowledge about the lack of protection from its side-impact protection feature and the lack of legitimacy of its side-impact testing put it on notice that its booster seats were not as it advertised.

212.    Britax's conduct includes incurable deceptive acts that Britax engaged in as part of a scheme, artifice, or device with intent to defraud or mislead, under Ind. Code § 24-5-0.5-2(a)(8).

213.    As a direct and proximate result of Britax's uncured or incurable unfair, abusive, and deceptive acts or practices, Indiana Plaintiff and absent Indiana Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing

Britax's Booster Seats.

214. Britax's violations present a continuing safety risk to Indiana Plaintiff, the Indiana Subclass and the general public. Britax's unlawful acts and practices complained of herein affect the public interest.

215. Indiana Plaintiff and Indiana Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $500 for each non-willful violation; the greater of treble damages or $1,000 for each willful violation; restitution; reasonable attorneys' fees and costs; injunctive relief; and punitive damages.

## COUNT IX
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Ind. Code. § 26-1-2-314)

216. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

217. This count is brought by Plaintiff Coleman on behalf of herself and members of the Indiana Subclass.

218. Britax is and was at all relevant times a merchant as defined by Ind. Code § 26-1-2-104.

219. A warranty that Britax's Booster Seats were in merchantable condition is implied in a contract for their sale pursuant to Ind. Code § 26-1-2-314.

220. Indiana Plaintiff and members of the Indiana Subclass purchased Britax's booster seats manufactured and marketed by Britax by and through Britax's authorized sellers for retail sale to consumers, or were otherwise expected to be the third-party beneficiaries of Britax's contracts with authorized sellers, or eventual purchasers when bought from a third party. At all

relevant times, Britax was the manufacturer, marketer, warrantor, and/or seller of the Britax Booster Seats. Britax knew or had reason to know of the specific use for which the booster seats were purchased.

221.    The Britax Booster Seats are and were at all relevant times goods within the meaning of Ind. Code § 26-1-2-105.

222.    Britax impliedly warranted that its booster seats were in merchantable condition and fit. Britax's Booster Seats when sold at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing protection for children in the event of a side-impact crash. Thus, Britax breached its implied warranty of merchantability for the ordinary purpose for which the Booster Seats are purchased and used.

223.    Britax cannot disclaim its implied warranty as it knowingly sold unsafe and hazardous Booster Seats.

224.    Britax was provided pre-suit written notice of its breach of the implied warranty. Affording Britax a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because Britax has known of and concealed the safety risks attendant to its booster seats.

225.    As a direct and proximate result of Britax's breach of the implied warranty of merchantability, Indiana Plaintiff and members of the Indiana Subclass have been damaged in an amount to be proven at trial.

226.    Indiana Plaintiff and members of the Indiana Subclass have been excused from performance of any warranty obligations as a result of Britax's conduct described herein.

## COUNT X
## VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (Fla. Stat. § 501.291 *et seq.* )

227.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

228.    Plaintiff Heather Brooke ("Florida Plaintiff") brings this count against Britax on behalf of herself and the Florida Subclass.

229.    Plaintiff and Florida Subclass members are "consumers" as defined by Fla. Stat. § 501.203(7).

230.    Britax advertised, offered, or sold goods or services in Florida and engaged in trade or commerce directly affecting the people of Florida within the meaning of Fla. Stat. § 501.203(8).

231.    Britax engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce, in violation of Fla. Stat. § 501.204(1).

232.    Britax's false representations and omissions as alleged herein were material because they were likely to deceive reasonable consumers.

233.    Had Britax disclosed to Florida Plaintiff and Florida Subclass members material facts, including but not limited to, the lack of side-impact protection from the advertised side-impact protection features and the lack of legitimate side-impact testing, Florida Plaintiff and the Florida Subclass members would not have purchased Britax's Booster Seats and/or the market value of the Booster Seats would have been lower. Instead, Britax kept these tests secret, and embarked on a disinformation campaign aimed at convincing millions that its Booster Seats are safe.

234.     As a direct and proximate result of Britax's deceptive acts and practices, Florida Plaintiff and Florida Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing Britax's Booster Seats.

235.     Florida Plaintiff and Florida Subclass members seek all monetary and non-monetary relief allowed by law, including actual or nominal damages under Fla. Stat. § 501.211(2); declaratory and injunctive relief; reasonable attorneys' fees and costs under Fla. Stat. § 501.2105(1); and any other relief that is just and proper.

## COUNT XI
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (Fla. Stat. § 672.314, *et seq.* )

236.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

237.     This claim is brought by Florida Plaintiff against Britax on behalf of herself and the Florida Subclass.

238.     Britax is and was at all relevant times a "merchant" as defined by Fla. Stat. § 672.104(1).

239.     A warranty that the Britax booster seats were in merchantable condition is implied by law pursuant to Fla. Stat. § 672.314(1).

240.     Florida Plaintiff and members of the Florida Subclass purchased the Britax Booster Seats manufactured and marketed by Britax by and through Britax's authorized sellers for retail sale to consumers or were otherwise expected to be the third-party beneficiaries of Britax's contracts with authorized sellers, or eventual purchasers when bought from a third party. At all relevant times, Britax was the merchant, manufacturer, marketer, warrantor, and/or seller of the

Britax Booster Seats. Britax knew or had reason to know of the specific use for which the Britax Booster Seats were purchased.

241.    The Britax Booster Seats are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 672.314.

242.    Britax impliedly warranted that the Britax Booster Seats were in merchantable condition and fit. The Britax Booster Seats when sold at all times thereafter were not in merchantable condition and were and are not fit for the ordinary purpose of providing safety and protection for children in the event of a side-impact collision. Thus, Britax breached its implied warranty of merchantability for the ordinary purpose for which the Britax Booster Seats are purchased and used.

243.    Britax cannot disclaim its implied warranty as it knowingly sold unsafe and hazardous Britax Booster Seats.

244.    As a direct and proximate result of Britax's breach of the implied warranty of merchantability, Florida Plaintiff and members of the Florida Subclass have been damaged in an amount to be proven at trial.

245.    Florida Plaintiff and members of the Florida Subclass have been excused from performance of any warranty obligations as a result of Britax's conduct described herein.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Classes, respectfully request that this Court enter an Order:

a.      Certifying the Nationwide Class and/or the State Subclasses and appointing Plaintiffs as the Class Representatives, and appointing Plaintiffs' Counsel as Class Counsel under Rule 23 of the Federal Rules of Civil Procedure;

b.      Declaring that Britax's failure to disclose the lack of protection from its side-impact protection feature and the lack of legitimate side-impact testing of the Booster Seat was negligent, deceptive, unfair, and unlawful;

c.      Finding that Britax's conduct was negligent, deceptive, unfair, and unlawful as alleged herein;

d.      Finding that Britax's conduct was in violation of the statutes and common law referenced herein;

e.      Awarding Plaintiffs and the other Class members actual, compensatory, punitive, and consequential damages;

f.      Awarding Plaintiffs and the other Class members statutory damages and penalties, as allowed by law;

g.      Awarding Plaintiffs and the other Class members restitution and disgorgement;

h.      Awarding Plaintiffs and the other Class members pre-judgment and post-judgment interest;

i.      Awarding Plaintiffs and the other Class members reasonable attorneys' fees costs and expenses; and

j.      Granting such other relief as the Court deems just and proper.


Dated: November 30, 2021                              Respectfully submitted,

                                                      */s/ Harper Todd Segui*
                                                      **MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
                                                      Harper Todd Segui
                                                      Federal ID No. 10841
                                                      Daniel K. Bryson
                                                      Martha A. Geer*
                                                      Sarah J. Spangenburg*
                                                      900 W. Morgan Street
                                                      Raleigh, NC 27603

T: 919-600-5000
F: 919-600-5035
hsegui@milberg.com
dbryson@milberg.com
mgeer@milberg.com
sspangenburg@milberg.com


**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
Gregory F. Coleman
Jonathan B. Cohen*
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0080
Facsimile: (865) 522-0049
gcoleman@milberg.com
jcohen@milberg.com

*Attorneys for Plaintiffs*

*admitted *pro hac vice**